# EXHIBIT 25

**The New York Times**

# On the List, and Not in a Good Way

**By Julie Satow**

Oct. 16, 2014

At New York City Housing Court, on the second floor of a dingy office building in Lower Manhattan, a woman sits quietly with a shawl pulled around her shoulders, looking up names on an old government computer and copying them into a sleek mini-laptop at her side. Behind her, tenants shift anxiously on their feet, clutching paperwork and waiting to speak with one of a handful of clerks sitting behind a glass partition.

The woman, who gives her name only as Carolyn out of fear of losing her job, sits at one of the three public-access computers in the room eight hours a day, five days a week. She is searching an online database for the names of tenants with cases before the court. The information she turns up will soon be compiled in a document and sold to landlords, who will use it as a kind of blacklist designed to prevent supposedly litigious or financially irresponsible tenants from renting apartments.

The state Office of Court Administration, which operates New York's court system, charges a $20,000 initial fee and $350 per week thereafter for a daily data feed of housing court cases. The seemingly innocuous list of index numbers identifies every new housing court matter and updates existing ones. The feed used to include tenants' names and addresses as well, but after years of complaints and negotiations, housing advocates and politicians thought they had won a victory when, in 2012, the Office of Court Administration began scrubbing that information.

But just as some Wall Street banks find ways to stay a step ahead of regulators, so, too, have companies that sell tenant names to landlords found a way around this hurdle. Under state law, housing court records are public, so the companies have taken to hiring people like Carolyn to spend hours plugging the index numbers on the court system's data feed into the electronic case files to find the corresponding

names and addresses. The resulting list can include anyone who was in court records, whether because they failed to pay rent, withheld it to force a landlord to make repairs, broke the terms of a lease, or as a result of a landlord's error.

Companies that compile the information for landlords "have an extra step now, and it costs them a bit more, but the result is still the same," said New York State Senator Liz Kruger, one of the elected officials who worked on the 2012 deal. "It is frustrating. We thought we had stopped these tenant blacklists, but the companies have found a way around it, and now it looks like we are back where we started."

Andres E. Correa wound up on one of the lists. Mr. Correa had been living in an illegal sublet for several years when the landlord sued the tenant whose name was on the lease to evict him, and also sued Mr. Correa. After hiring a lawyer, Mr. Correa, who said he was unaware the sublet was illegal, struck a deal with the landlord: In the court case, Mr. Correa would be identified only as Andres Doe. When the case was settled, however, Mr. Correa's name was recorded in the court records and then picked up by a tenant-screening company.

You have 4 free articles remaining.
Subscribe to The Times

"It has been a nightmare," said Mr. Correa, adding that he had been unable to sign a lease and had moved eight times in the past two years. Eventually, he hired James B. Fishman, a lawyer who has brought two class actions against screening firms, to help him clear his name.

Nearly all landlords, whether small-time or with thousands of units, perform background checks on prospective tenants. Numerous screening companies offer those who hire them various options to choose from, such as criminal records, watch lists for sexual offenders and eviction histories. Typically, the housing court information notes whether a tenant has been sued, the type of case, the amount of rent the landlord claimed and the outcome.

Federal credit-reporting laws allow screening companies to report information going

back seven years, and landlords across the country are able to view it.

"It is a balancing act between public information and the misuse of public information," said David Bookstaver, a spokesman for the Office of Court Administration. "We were responsive to advocacy groups who believed that the selling of names was leading to misuse," he said, "and the reality is, this has made it a lot harder for people to misuse the information."

It certainly has made it more costly. For the past year and a half, Carolyn, 31, who is herself a tenant in Queens, has been paid by the hour to sift through a mountain of data for her employer. She declined to name the company, but there are only three firms currently paying the Office of Court Administration for its housing court-data feed: CoreLogic SafeRent, TransUnion Rental Screening Solutions and ALM, a legal media company. After compiling the lists of names, they can then sell the information to other screening companies or directly to landlords.

There are typically 300 to 400 housing court judgments filed each day in New York City. Carolyn said that it took her up to two weeks to update the information for a single borough, adding that she was running about six months behind.

Sitting day after day in such proximity to those whose names she is gathering takes its toll. "It's a job. The company sends me a list of case numbers and it is basically like data entry," she said. Her employers are based in the South, and she rarely has direct contact with them; she has far more with the people she is profiling. "Sometimes it is difficult. I know that not all tenants are bad tenants, and some people fall on bad times."

Some tenants know what she is doing. She said a woman once screamed at her, "telling me that she knows what I do is just a job, but that people should know there is a tenant blacklist. And then people come in all the time and ask if their name is in the system, and if that means they are on the blacklist. I mean, c'mon. Yes!"

Most tenants do not realize that housing court information can be used against them, said Judge Fern A. Fisher, who, as the deputy chief administrative judge for New York City Courts, oversees housing court. "I don't think most people are aware that

companies have access to what happens in housing court. They should, but I think more people are concerned with keeping a roof over their heads."

Even winning a case may not keep someone off a bad-tenant list. If a tenant withholds rent to force a landlord to make repairs and the judge ultimately sides with the tenant, the only thing that shows up on a screening report is that there was a money judgment against the tenant for the remaining rent owed. Some tenants may even find themselves on a list mistakenly because their name is a common one.

None of the list brokers would comment on how the data they collect is used, but CoreLogic's website is clear about the rationale: "Experience shows that past lease performance is the single most important predictor of future resident behavior."

Screening companies typically have their own systems for flagging potentially troublesome tenants. And while some landlords simply follow along, others adopt a more thorough approach. "I don't necessarily disqualify a tenant when I see there has been a housing court case," said Robert J. Klehammer, the vice president of multifamily rental management at FirstService Residential New York, which manages 8,000 rental apartments across the city. "But I will ask the broker to go back and get an explanation."

Mr. Klehammer is perhaps more understanding than many, having spent over a decade working as an assistant commissioner at the New York City Department of Housing Preservation and Development. But, he said, screening reports are critical for weeding out problems. "There are a lot of people out there who lie. And it is up to us, as a third-party manager, to make sure we don't rent to any bad tenants."

Money is also an issue. "Most of our fees are based on the rents we collect, so if a tenant is delinquent on their rent, I don't earn a fee. That puts a premium on me to get tenants who will pay the rent."

A version of this article appears in print on Oct. 19, 2014, on Page MB10 of the New York edition with the headline: On the List, and Not in a Good Way