**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------X

**CLAUDINNE FELICIANO,**

                                                        **Case No. 1:17-cv-5507**

        **Plaintiff,**

        **-against-**

**CORELOGIC RENTAL PROPERTY**
**SOLUTIONS, LLC**

        **Defendant.**

-------------------------------------------------------------------------X

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

TROUTMAN SANDERS LLP
875 Third Avenue
New York, NY 10022

*Attorneys for CoreLogic Rental Property Solutions, LLC*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

UNDISPUTED FACTS ...................................................................................................... 3

I.      RPS OBTAINS RECORDS FROM GOVERNMENTAL AGENCIES AND
        THEN APPLIES RIGOROUS QUALITY-ASSURANCE AND UPDATING
        PROCEDURES............................................................................................................ 3

II.     PLAINTIFF'S ALLEGATIONS IN THE OPERATIVE AMENDED
        COMPLAINT. ........................................................................................................... 6

III.    PLAINTIFF REVISED HER LIABILITY THEORY TO BECOME THE CLASS
        REPRESENTATIVE. ................................................................................................. 6

IV.     THE ABOVE PROCESSES, AS APPLIED TO PLAINTIFF'S JULY 21, 2015
        SCREENING REPORT............................................................................................... 7

V.      DISCOVERY HAS CONFIRMED PLAINTIFF'S HOUSING COURT RECORD
        DID NOT REFLECT A DISPOSITION AT THE TERMINAL THAT WAS
        DATED MAY 29, 2015, AS SHE CLAIMED.................................................................. 8

VI.     PLAINTIFF HAS NO EVIDENCE THAT RPS'S PRACTICES WITH
        RESPECT TO THE COLLECTION AND REPORTING OF THE RECORD OF
        HER 2014 PROCEEDING WERE "UNREASONABLE." ............................................. 10

LEGAL STANDARD......................................................................................................... 11

ARGUMENT .................................................................................................................... 12

I.      PLAINTIFF IS BOUND BY THE ALLEGATIONS IN HER COMPLAINT
        REGARDING THE ALLEGED MANNER THAT RPS SHOULD HAVE
        ACTED, WHICH IS PRECISELY HOW RPS ACTED FOR HER RECORD............. 12

II.     EVEN IF PLAINTIFF COULD CHANGE HER PROFFERED LIABILITY
        THEORY, SHE HAS NO PROOF OF THE LIABILITY THEORY, WHICH
        IMPLICATES THE CONTENT OF THE OCA DATA FEED IN JULY 2015. ............ 13

III.    RPS'S COLLECTION AND REPORTING OF PLAINTIFF'S HOUSING
        COURT PROCEEDING WAS REASONABLE, AND PLAINTIFF HAS NO
        EVIDENCE TO SUBSTANTIATE HER CONTRARY CLAIM.................................. 14

        A.      Plaintiff has no evidence to support her claim that RPS's procedures were
                unreasonable with respect to the reporting of her housing court record.............. 14

        B.      There is no evidence of any "willful" violation of the FCRA. ........................... 18

**TABLE OF CONTENTS**
(continued)

Page

IV.   PLAINTIFF'S CLAIM THAT THE PUBLIC ACCESS TERMINAL
      REFLECTED A DISPOSITION FOR HER HOUSING COURT PROCEEDING
      ON MAY 29, 2015 IS INACCURATE. ........................................................................ 20

CONCLUSION ............................................................................................................... 21

**SUPPORTING DOCUMENTS AND EXHIBITS**

Local Rule 56.1 Statement of Material Facts, June 19, 2020

Declaration of Autumn Deloatche, June 12, 2020

Exhibit A. Research Handbook Master Copy, March 28, 2012

Exhibit B. Example Audit Report

Exhibit C. Housing Court Records, CLF000085

Declaration of Autumn Ernst, June 15, 2020

Declaration of Timothy St. George, June 18, 2020

Exhibit D. Ex. 28 to Plaintiff's Memorandum in Support of her Motion for Class Certification

Exhibit E. Screening Report, CLF000086-000094

Exhibit F. Excerpts of the Deposition of Andrew Sherer

Exhibit G. Declaration of Margarita J. Fraser de Abadie in Support of Plaintiff's Motion for
Class Certification

Exhibit H. Excerpts of the Deposition of Margarita J. Fraser de Abadie

Exhibit I. Ex. 29 to Plaintiff's Memorandum in Support of her Motion for Class Certification

Exhibit J. Excerpt of a document produced by Plaintiff on July 12, 2019, FELICIANO000062

Exhibit K. Declaration of William Yates in Support of Plaintiff's Motion for Class Certification

Exhibit L. Excerpts of the Deposition of William Yates

Exhibit M. Expert Report of Dr. Raisa A. Bahchieva

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bay v. Times Mirror Magazines. Inc.*,
  936 F.2d 112 (2d Cir. 1991)...................................................................................13

*Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*,
  757 F.2d 523 (2d Cir. 1985)...................................................................................12

*Beyer v. Cnty. of Nassau*,
  524 F.3d 160 (2d Cir. 2008)...................................................................................11

*Brown v. Henderson*,
  257 F.3d 246 (2d Cir. 2001)...................................................................................11

*Childress v. Experian Info. Solutions, Inc.*,
  790 F.3d 745 ...........................................................................................................18

*Collins v. Experian Credit Reporting Serv.*,
  494 F. Supp. 2d 127 (D. Conn. 2007)....................................................................21

*E. Texas Motor Freight Sys. Inc. v. Rodriguez*,
  431 U.S. 395 (1977)................................................................................................20

*Frost v. Experian Information Solutions, Inc.*,
  No. 98 Civ. 2106, 1998 WL 765178 (S.D.N.Y. Oct. 30, 1998) .............................15

*Frydman v. Experian Info. Solutions, Inc.*,
  No. 14cv9013, 2016 WL 5661596 (S.D.N.Y. Aug. 11, 2016) ...............................19

*Gross v. Nat'l Broad. Co., Inc.*,
  232 F. Supp. 2d 58 (S.D.N.Y. 2002).......................................................................11

*Haro v. Shilo Inn, Bend LLC*,
  No. 08-6306, 2009 WL 2252105 (D. Or. July 24, 2009).......................................16

*Houston v. TRW Information Services, Inc.*,
  No. 88 Civ. 0186, 1989 WL 59850 (S.D.N.Y. May 1, 1989) .................................15

*Lucion G. Banks v. Hireright, Inc.*,
  No. BC 492317, 2014 Cal. Super. LEXIS 251 (2014) ..........................................15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)................................................................................................11

*Moore v. First Advantage Enter. Screening Corp.*,
   No. 4:12 CV00792, 2013 WL 1662959 (N.D. Ohio Apr. 17, 2013) ......................................15

*Nguyen v. Ridgewood Sav. Bank*,
   No. 14-CV-1058, 2015 WL 2354308 (E.D.N.Y. May 15, 2015) .............................................12

*Ogbon v. Beneficial Credit Servs., Inc.*,
   No. 10-3760, 2013 WL 1430467 (S.D.N.Y. Apr. 8, 2013) ...............................................12, 19

*Robertson v. Experian Info. Solutions*,
   No. 1:CV09-0850, 2010 U.S. Dist. LEXIS 39616 (E.D. Pa. Apr. 10, 2010) .........................19

*Rojas v. Roman Catholic Diocese of Rochester*,
   783 F. Supp. 2d 381 (N.D.N.Y. 2010) ...................................................................................12

*Safeco Ins. Co. of Am. v. Burr*,
   551 U.S. 47 (2007) ...........................................................................................................18, 19

*Southwick Clothing LLC v. GFT (USA) Corp.*,
   No. 99 CV 10452, 2004 U.S. Dist. LEXIS 25336 (S.D.N.Y. Dec. 15, 2004) .......................13

*Tompkins v. R.J. Reynolds Tobacco Co.*,
   92 F. Supp. 2d 70 (N.D.N.Y. 2000) .......................................................................................14

*Wenning v. On-Site Manager, Inc.*,
   No. 14cv9693, 2016 U.S. Dist. LEXIS 81126 (S.D.N.Y. June 22, 2016) .................17, 18, 19

*Whelan v. Trans Union Credit Reporting Agency*,
   862 F. Supp. 824 (E.D.N.Y. 1994) .........................................................................................12

*Wright v. Experian Info. Sols., Inc.*,
   805 F.3d 1232 (10th Cir. 2015) ..............................................................................................15

**Statutes**

15 U.S.C. § 1681............................................................................................................... *passim*

N.Y. Gen. Bus. Law § 380-j(e) ...........................................................................................2, 12

**Other Authorities**

Fed. R. Civ. P. 56 ...................................................................................................................11

Fed. R. Civ. P. 702..................................................................................................................11

Defendant, CoreLogic Rental Property Solutions, LLC (RPS"), by counsel, submits this memorandum of law in support of its Motion for Summary Judgment (the "Motion").

## INTRODUCTION

RPS collected records of New York housing court proceedings directly at the housing court clerks' offices public access terminals, trained its employees to accurately document all available information about those proceedings, and then reported to landlords all data that had been manually collected. No party disputes those basic facts, and all parties acknowledge the reliability of the public access terminals. Numerous courts nationwide also have affirmed, as a matter of law, the reasonableness of the collection of data at the originating government source. Indeed, the process of going to the clerk's offices to gather records is precisely what Plaintiff alleges in her Complaint that RPS _should have done_, but which she mistakenly alleged RPS did not do.

Even more, discovery has revealed that Plaintiff's claim that the public access terminal reflected a disposition for her housing court action before the date of RPS's reporting is false. Therefore, the factual basis by which Plaintiff claimed to have established an "inaccuracy" in RPS's reporting – another essential element of her claims – has been disproven.

The facts regarding RPS's reporting in this case are straightforward. Plaintiff was named as a defendant in a Manhattan housing court proceeding in September 2014. RPS gathered that record at the public access terminal in the clerk's office in the Manhattan housing court in late June 2015. RPS reported the existence of Plaintiff's record to a potential landlord _a mere three weeks later_ in July 2015. When RPS first viewed the record in June 2015, its field researcher noted that the public access terminal did not reflect any information regarding the disposition of Plaintiff's action at that time. That lack of a disposition after nine months is common in New York City housing court proceedings. However, Plaintiff alleges that her housing court action had, in fact, been discontinued by the time it was reported by RPS. That allegation forms the basis for

Plaintiff's claim that RPS's practices for reporting her housing record were "unreasonable," and violate parallel provisions of the Fair Credit Reporting Act ("FCRA") at 15 U.S.C. § 1681e(b) and the New York Fair Credit Reporting Act ("NYFCRA") at N.Y. Gen. Bus. Law § 380-j(e), as asserted in Counts I and II of the Amended Complaint.[1]

Many cases under § 1681e(b) and N.Y. Gen. Bus. Law § 380-j(e) are sent to a jury for resolution.  But this case can be easily disposed of on summary judgment on multiple grounds.

First, Plaintiff alleges in the Amended Complaint that RPS should have undertaken the "reasonable" practice of sending its employees to housing courts to view case files in the court clerk's offices.  That is precisely what RPS did.  Plaintiff is bound by those factual allegations.

Second, Plaintiff has acknowledged that she does not question the accuracy of the data on the public access terminals, which are linked directly to the clerk's systems and databases.  Thus, during the discovery phase of this case, she attempted to change her liability theory to claim that RPS should have used another data file to "supplement" its records of housing court proceeding at the time of its reporting.  Plaintiff, however, did not obtain any copies of that data file in discovery.  She, therefore, has no evidentiary basis to argue that the data file could have been used by RPS to "supplement" her report.

Third, RPS collected Plaintiff's record at the public access terminal.  Plaintiff admits that the public access terminals are reliable sources of data.  Plaintiff's September 2014 housing court proceeding also was nine months old at the time that it was recorded by RPS at the end of June 2015.  RPS then reported out that record of Plaintiff's proceeding just _three weeks later_.  Despite claiming that such a practice was "unreasonable," Plaintiff admits that she has no evidence of what

---

[1] Using the class lists provided by Plaintiff, this Court previously certified a class of consumers in this case based on the factual claims of data inaccuracy and "unreasonable" procedures that were advanced by Plaintiff in her motion for class certification.  In reaching its certification decision, the Court was explicit that RPS would be able to later address the "merits" of Plaintiff's contentions.  That day has arrived.

percentage of nine-month-old housing court cases would be expected to reach a disposition just three weeks later.  Therefore, she has no evidentiary basis to argue that a three-week gap between the collection of her housing court record and its reporting in July 2015 was unreasonable.

Fourth, even if a negligent violation of the FCRA and NYFCRA were somehow possible based on these facts, the Court should dismiss Plaintiff's contention that RPS "willfully" violated the law.  Such a claim requires proof that RPS assumed an "unjustifiably high risk" of inaccuracy. Plaintiff has no evidence to make such a claim, nor do the facts remotely support that contention.

Finally, Plaintiff represented to the Court in her class certification that the public access terminals reflected a "disposition" of her court case on May 29, 2015, which preceded RPS's July 2015 reporting.  On that basis, Plaintiff included herself on the class list that was certified by the Court.  Yet, what Plaintiff claimed to be a May 29, 2015 "disposition" was instead, in reality, a notation by the Manhattan housing court clerk that the electronic record of her case had been converted to a new software system that the Manhattan housing court began using on May 29, 2015.  There was no disposition, just a software upgrade.

## UNDISPUTED FACTS

**I.**     **RPS obtains records from governmental agencies and then applies rigorous quality-assurance and updating procedures.**

RPS offers a suite of services to leasing agents, one of which is a tenant screening report. (*See* Local Rule 56.1 Statement of Material Facts, ¶ 1, June 19, 2020 ("SMF").)  Upon a request for a report – and the submission of personal identifying information about the applicant to RPS by the leasing agent – RPS identifies any housing court data about the applicant.  (*Id.* at ¶ 2.)

In July 2015, which is when Plaintiff's record was reported, RPS collected information about New York housing court actions by using its own field researchers across the state, which were sent to the clerk's offices to individually review and retrieve records directly at the public

access terminals.  (SMF at ¶¶ 3, 18.)  Those records were collected by those field researchers, and they were then updated and audited routinely to assure their accuracy/currency.  (*Id.* at ¶ 3.)  A description of that process follows.

Training Provided by RPS.  Prior to being sent to collect records, RPS's personnel were subject to extensive training.  Each field researcher was assigned a detailed manual regarding how such court information was to be collected, and each researcher would be required to undertake multiple days of side-by-side training with an experienced supervisor before beginning the data collection process.  (SMF at ¶ 4.)  RPS's collection manuals, along with the required in-person training, instructed the field researchers to gather all available information about any New York housing court proceeding, including any available disposition, and to then key that information into the laptop that had been assigned to the field researcher by RPS.  (*Id.* at ¶ 5.)

The Collection Process.  The field researchers would begin each day by locating the index number for the housing court action that followed immediately after the last action that had been reviewed by the field researchers on the preceding business day.  Once located, the field researcher would individually bring up each court case on the public access terminal and then transcribe all information about the case directly into the secure laptop, including (among other data points) the parties, the date of filing, and the disposition (if any).  (SMF at ¶ 6.)  The data keyed in by the field researchers was then transmitted to RPS on a nightly basis through a secure portal for entry into its internal databases, after which time it would then be available for return.  (*Id.* at ¶ 7.)

Updating Records.  The job responsibilities of RPS's field researchers were not limited to the collection of data about New York housing court proceedings not previously reviewed by field researchers.  RPS's field researchers were also charged with going back to update the status of records that had previously been recorded, but which did not reflect a disposition at the time of initial collection.  (SMF at ¶ 8.)  For those records, RPS's systems would generate a comprehensive

4

report each month and send a list of those case index numbers to the field researcher that was responsible for that specific housing court.  RPS's field researchers were then required to go back and review each such case on the monthly report to determine whether a disposition had since been entered for the record.  If so, that disposition was then recorded by the field researcher, and the record would then no longer appear on the monthly reports.  (*Id.* at ¶ 9.)

RPS followed that updating procedure for a period of up to six months after the record was first collected.  (SMF at ¶ 9.)  If RPS had previously collected the record and the record was being updated to reflect the existence of a disposition, then the updated data points would be added to the existing record.  The fully-updated record would then available for return by RPS to its landlord customers in connection with any future request.  (*Id.* at ¶ 10.)

RPS's Audit Process.  In addition to these collection procedures, RPS also maintained a robust audit process to ensure the quality of the data being collected by its field researchers. (SMF at ¶ 11.)  Each month, RPS's system would generate a random sample of court actions previously collected by the field researchers, and RPS would send that random sample of court index numbers to the field collector supervisors for an "audit."  (*Id.* at ¶ 12.)  The supervisor would then take that sample and personally travel to the New York housing court clerk's offices and terminals to review the previously-input data for the identified cases to ensure its accuracy.  (*Id.* at ¶ 13.)

RPS's supervisor for the New York City housing court collection process confirmed that, during her review of hundreds of such records during over a period of years, she did not identify any issues with the accuracy of the data collected by the field researchers.  (SMF at ¶ 14.)  RPS was also unaware from any other source of any issues with the accuracy/completeness of the data displayed on the New York City public access terminals.  (SMF at ¶ 15.)

Each of these processes was in place with respect to the collection of Plaintiff's housing court record in 2015.  (SMF at ¶ 16.)

II.     **Plaintiff's allegations in the operative Amended Complaint.**

The New York Office of Court Administration ("OCA") previously made available a daily file of data on New York housing court cases.  As of 2011, however, Plaintiff admits that the OCA file had been "stripped" of all personal identifiers, *see* Dkt. No. 36 at p. 10, meaning that it was not possible to determine from the file the parties to the lawsuit or even the number of parties, which was particularly-problematic in multi-party actions.

With that context in mind, Plaintiff litigated this case under the operative Amended Complaint by alleging that RPS had "continued purchasing electronic records from the [OCA] about proceedings brought before various housing courts in New York and [was] failing to ensure that the information it complies from this record (and then sells commercially to landlords, real estate companies, and the like) is complete, accurate or fair."  (Compl., ¶ 2.)  Plaintiff asserted that RPS "obtains data about housing court proceedings in electronic form from a data feed issued by the OCA on a daily basis," and that "[RPS] does not, as a routine policy or practice . . . send an employee agent, or representative to the office of any New York Housing Court, or any other location maintained by the [Unified Court System] to view any court files or documents filed with that court."  (Compl., ¶¶ 19, 24.)  On those bases, Plaintiff claimed that RPS "fails to ensure that the credit reports it sells comply with the FCRA or NYFCRA."  (Compl., ¶ 2.)

III.    **Plaintiff revised her liability theory to become the class representative.**

Without ever seeking to further amend the Amended Complaint, Plaintiff reversed her liability theory on class certification, claiming that RPS should have used the OCA data file – the very practice she *disparaged* in her Complaint.  In particular, she presented in her motion for class certification as her common proof of "unreasonableness" the contention "all [RPS] needed to do was to match up the information that the OCA was already providing to it with the information [RPS] had in its system."  (Dkt. No. 36 at p. 11.)  Plaintiff then reiterated that theory in her reply

brief supporting class certification, arguing that "RPS willfully disregarded the daily stream of data it received daily from the OCA." (Dkt. No. 67 at p. 23.)[2]

**IV.     The above processes, as applied to Plaintiff's July 21, 2015 screening report.**

On September 25, 2014, Plaintiff was named as a defendant in a housing court action filed in Manhattan housing court (LT-079004-14/NY) due to her non-payment of rent.  (SMF at ¶ 16.) The record of Plaintiff's September 2014 proceeding was collected by an RPS field researcher at the public access terminal on June 29, 2015 and then entered into RPS's systems.  (*Id.* at ¶ 18.) The clerk's public access terminal did not reflect a disposition for Plaintiff's housing court record at the time of collection.  (*Id.* at ¶ 19.)

Just three weeks after the record of Plaintiff's housing court proceeding was gathered by RPS and loaded into its database, RPS received a request on July 21, 2015 from one of its landlord customers, Hunter's Point South Commons ("Hunter's Point"), for a tenant screening report on Plaintiff.  The request from Hunter's Point provided Plaintiff's full name, date of birth, and Social Security number.  In response to that request, RPS returned a screening report.  (SMF at ¶ 21.) In that report, among numerous other data points, Plaintiff's September 2014 housing court action was identified, and the disposition was listed as "Case Filed," meaning that the record lacked a displayed disposition at the public access terminal.[3]  (*Id.* at ¶ 22.)

Additionally, despite basing her liability theory on the contents of the OCA file, Plaintiff took no discovery of the OCA or the OCA file.   (SMF at ¶ 23.)  Thus, whether her record and additional disposition information appeared on the OCA file as of July 2015 – such that she could

---

[2] Plaintiff continues to advance this theory in a motion filed just last month, stating that RPS should have "utilized the court system's daily electronic feed."  (Dkt. No. 117 at p. 12.)

[3] Pursuant to RPS's "updating" processes described above, it was RPS's policy to review the 2014 record for an additional six months through the period of July to December 2015 to determine whether a disposition was entered by the clerk of court.  However, no updated disposition was ever located for Plaintiff's 2014 housing court record during that window.  SMF at ¶ 20.

prove that it would have been available to augment RPS's July 21, 2015 reporting – is unknown. (*Id.*)  Plaintiff also did not develop any evidence in discovery that the OCA data file would have reflected more information than the public access terminals accessed by RPS, including as to her housing court record.  (*Id.*)  Rather, her expert witness confirmed that the terminals were tied to "database maintained by the OCA," and that the "OCA data feed" would be the same information entered by the "court clerks" and "displayed on the public access terminal," including with respect to Plaintiff's housing court case.  (*Id.* at ¶ 24.)

**V.      Discovery has confirmed Plaintiff's housing court record did not reflect a disposition at the terminal that was dated May 29, 2015, as she claimed.**

During the last two months of the discovery period in this case in 2019, Plaintiff hired two freelance collectors (William Yates and Margarita Abadie) to go to the public access terminals and view court records.  For their proof of "inaccurate" reporting by RPS, Plaintiff's freelancers compared: (1) a list of New York housing court actions that were gathered and then later reported by RPS years ago; with (2) the content of data they claim was viewable on the public access terminals in 2019.  (SMF at ¶ 25.)  Plaintiff's freelancers then identified any record where they claimed that the terminal showed any type of "disposition."   And, for any record that the freelancers claimed had a disposition before the identified date of RPS's reporting, that consumer became a class member on the lists that were later certified by the Court.  (*Id.* at ¶ 26.)

Ms. Abadie is the freelancer that reviewed Plaintiff's case (LT-079004-14/NY) in 2019 at the public access terminal.  (SMF at ¶ 27.)  As a result of that research, Ms. Abadie identified in her declaration that Plaintiff's action reflected a "disposition" dated "May 29, 2015," which was "before" the July 2015 RPS report, thus generating an "inaccuracy" that made Plaintiff a class member on the class lists that were certified.  (*Id.* at ¶ 29.)  The relevant excerpt from that class list was as follows:

| # | Request Number | Request Date | Case Number | Case Disposition | Case Filing Date | Case Court | Disposition | Disposition Date | Before or After? | Discrepancies |
|---|---|---|---|---|---|---|---|---|---|---|
| 818 | 862 | 07/21/2015 | LT-079004-14/NY | *CASE FILED | 2014-09-25 | MANHATTAN | Disposed | 05/29/15 | Before | |

Months after discovery and full briefing on class certification closed, however, Plaintiff's counsel produced in July 2019 the underlying documents showing their freelancer's work. The notes from Ms. Abadie's research reflect that Plaintiff's case was listed as "inactive" on the public access terminal as of May 29, 2015, *i.e.*, that it *continued to lack any disposition* at the time a report was prepared by RPS. (SMF at ¶ 32.) The except of those notes is as follows:

| B62 | N8351796 | 7/21/2015 | LT-079004-14/NY | *CASE FILED | 2014-09-25 | MANHATTAN | N 5D | 5-29-15 | BEFORE | INACTIVE |
|---|---|---|---|---|---|---|---|---|---|---|

Ms. Abadie then confirmed in her Court-ordered deposition[4] that she had "frequently" included "inactive" cases on her class list, which is why she made that error in categorization for Plaintiff's record by labeling it as a "disposition."[5]  (*Id.* at ¶ 30.)

Furthermore, in addition to Ms. Abadie's declaration, Plaintiff presented in her motion for class certification a screenshot from the terminal taken in 2019. That screenshot showed her record with a disposed reason of "conversion – inactive," dated "May 29, 2015," and with an entry of "disposed by" the "Office, Clerk's." (SMF at ¶ 33.) That exhibit to the brief showed the following:

---

[4] Her deposition and the deposition of Mr. Yates were ordered by the Court after the close of discovery and class certification briefing based on the prior non-disclosure of those witnesses. (*See* Dkt. No. 80.)

[5] That error is not surprising, as Ms. Abadie has no training in collecting public records. (SMF at ¶ 28.) Mr. Yates made the same admission about listing "inactive" cases as being "disposed." (*Id.* at ¶ 30.) Even more, both freelancers admitted that they included any type of disposition in their class lists – including instances where judgment was entered *against* the consumer – despite the fact that the class definition certified was limited to consumers where the housing court action was withdrawn, dismissed, or discontinued. (*Id.* at ¶ 31; Compl., ¶ 11.)



Yet, as confirmed by Peter Catella, Supervisor, Assistant Deputy Chief Clerk of the New York

County Civil Court Clerk's Office, the entry of "conversion – inactive" does not reflect any

disposition of a housing court case, and instead reflects an *administrative entry* populated when

the housing court's software systems were being converted across the five boroughs in the summer

of 2015.[6]  (SMF at ¶ 34.)  Mr. Catella also confirmed that fact with respect to Plaintiff's specific

housing court record (Index No. LT-079004-12/NY), meaning that there was no actual disposition

associated with that record in the Court's systems, even in 2020.  (*Id.*)

Plaintiff's expert likewise confirmed that the "conversion – inactive" notation *was not* a

disposition used in New York housing court proceedings.  (SMF at ¶ 36 (Q: Are you familiar

[with] any disposition in the housing court system that's 'conversion-inactive'?  A: No.").)

**VI.    Plaintiff has no evidence that RPS's practices with respect to the collection and reporting of the record of her 2014 proceeding were "unreasonable."**

As noted above, Plaintiff's September 25, 2014 housing court action was collected by RPS

directly at the public access terminal on June 29, 2015 and then reported out to Hunter's Point just

---

[6] That is also why a review of the spreadsheets presented by Plaintiff as her class lists (Exhibits 29 and 30 to Plaintiff's motion for class certification) demonstrates that almost 1,000 entries on those spreadsheets have recorded "dispositions" on just eleven days (May 27-29, 2015 (all Manhattan); June 23-25, 2015 (all Queens); July 21-22, 2015 (all Brooklyn); and August 17-19, 2015 (all Bronx) between May 9, 2015 and August 19, 2015). (SMF at ¶ 35.) Those were the same date ranges confirmed by Mr. Catella to reflect the software upgrades and associated administrative entries of a "conversion" of records of actions. (*Id.*)

three weeks later on July 21, 2015.  (SMF at ¶¶ 17-18, 21-22.)  Plaintiff has no evidence of what percentage of nine-month-old housing court proceedings (like hers) would be expected to have a disposition by month ten (which was the age of the record when RPS reported it in July 2015).  In response to that question, Plaintiff's expert conceded that "[he] is not able to tell you that" percentage, further conceding that he was not aware of any "empirical" evidence in that regard and did not attempt to develop any such evidence.  (*Id.* at ¶ 37.)  In fact, Plaintiff's expert witness could only provide a self-described "*guesstimate*" as to what percentage of housing cases would be expected to result in some sort of disposition even after six months, as opposed to simply remaining open without any disposition, which Plaintiff's expert also conceded is a very common occurrence in housing cases.[7]  (*Id.* at ¶ 38.)

### LEGAL STANDARD

Summary judgment is required where the moving party shows that "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008).

To survive a summary judgment motion, a plaintiff "must come forth with evidence sufficient to allow a reasonable jury to find in [his] favor."  *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "Mere conclusory statements, conjecture or speculation" will not defeat summary judgment.  *Gross v. Nat'l Broad. Co., Inc.*, 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002).

---

[7] Based on this truly-remarkable lack of rigor, along with many other defects, RPS will be moving to exclude Plaintiffs' "expert" under Fed. R. Civ. P. 702 if this case survives summary judgment.

<u>**ARGUMENT**</u>

With respect to Plaintiff's claims in Counts I and II, both the federal FCRA and the NYFCRA provide, "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."  For her claims, Plaintiff must prove each of the following elements: "(1) the consumer reporting agency was negligent in that it failed to follow reasonable procedures to assure the accuracy of its credit report; (2) the consumer reporting agency reported inaccurate information about the plaintiff; (3) the plaintiff was injured; and (4) the consumer reporting agency's [violation] proximately caused the plaintiff's injury."  *Whelan v. Trans Union Credit Reporting Agency,* 862 F. Supp. 824, 829 (E.D.N.Y. 1994).

Merely reporting inaccurate information is <u>*insufficient*</u> to give rise to liability under the FCRA, as the FCRA is not a "strict liability" statute.  *Nguyen v. Ridgewood Sav. Bank*, No. 14-CV-1058, 2015 WL 2354308, at *31 (E.D.N.Y. May 15, 2015).  Even if an inaccuracy is identified, a plaintiff must establish that the procedures used to generate the report were "unreasonable," and "willfully" so (if alleged, as here).  *Id.*

N.Y. Gen. Bus. Law § 380-j(e) "is substantially similar to [§ 1681e(b)] [and], it must be construed the same way."  *Ogbon v. Beneficial Credit Servs., Inc*., No. 10-3760, 2013 WL 1430467, at * 24 (S.D.N.Y. Apr. 8, 2013).  Therefore, Counts I and II can be analyzed together.

**I.    Plaintiff is bound by the allegations in her Complaint regarding the alleged manner that RPS should have acted, which is precisely how RPS acted for her record.**

"[A] party cannot attempt to defeat a summary judgment motion by contradicting factual allegations in his complaint."  *Rojas v. Roman Catholic Diocese of Rochester*, 783 F. Supp. 2d 381, 407 (N.D.N.Y. 2010) (citing *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 - 29 (2d Cir. 1985)).  That is because "factual allegations [in a plaintiff's complaint] are judicial

admissions that bind plaintiffs throughout the course of the litigation.  [Thus,] plaintiffs cannot survive a summary judgment motion by contradicting their own pleadings in an effort to raise a genuine issue of fact."  *Southwick Clothing LLC v. GFT (USA) Corp.*, No. 99 CV 10452, 2004 U.S. Dist. LEXIS 25336, at *6 (S.D.N.Y. Dec. 15, 2004).

Plaintiff's Amended Complaint sets forth a liability theory predicated <u>*exclusively*</u> on the factual contention that RPS was using the OCA daily data feed and not visiting courthouses to collect records of New York housing court proceedings.  (*See generally* Compl., ¶¶ 2, 19-25.) Those contentions are false.  RPS instead undertook the business practice that Plaintiff alleges RPS <u>*should have taken*</u>, which was to "send an employee, agent or representative to the office of any New York Housing Court" to view and record the record of her case.  (*See* Compl., ¶ 24.)  Thus, summary judgment is required.

**II.     Even if Plaintiff could change her proffered liability theory, she has no proof of the liability theory, which implicates the content of the OCA data feed in July 2015.**

"[W]here the nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim."  *Bay v. Times Mirror Magazines. Inc.*, 936 F.2d 112, 116 (2d Cir. 1991).

Plaintiff bears the burden of proof on her claim that RPS acted unreasonably using the public access terminals to gather and update the records of her housing action.  And, as detailed above, Plaintiff's liability theory of "unreasonableness" is the assertion that RPS should have used the OCA data file to supplement and update its public access terminal collection process.[8]

Yet, Plaintiff did not obtain the OCA data file in discovery.  (SMF at ¶ 23.)  Thus, there is no evidence that the OCA feed reflected Plaintiff's housing court action as of July 2015, meaning

---

[8] That was the question adopted by the Court in certifying the class on the basis of Plaintiff's argument, holding that it was the "alleged failures in developing suitable procedures to access and update the information" on the OCA data file "that forms the basis of Plaintiff's claim."  (Dkt. No. 89 at p. 16.)

that Plaintiff cannot prove the factual basis for her contention that the OCA data file could have been used to supplement RPS's reporting of Plaintiff's record to Hunter's Point in July 2015. There also is no evidence that the OCA file reflected any additional disposition information as of July 2015 than what RPS had already gathered from the public access terminal just three weeks prior. The claim that the OCA data feed should have been used to supplement RPS's reporting also is belied by Plaintiff's expert's admission that the OCA data feed was derived from what was reflected on the public access terminal, which RPS was already viewing. (*Id.* at ¶ 24.)

For these reasons, the claim fails. *See, e.g.*, *Tompkins v. R.J. Reynolds Tobacco Co.*, 92 F. Supp. 2d 70, 91 (N.D.N.Y. 2000) (granting summary judgment: "Plaintiffs offer no proof of the feasibility of the alternate designs they advance. For the same reasons the strict liability claim fails, the negligent design defect claim must be dismissed.").

**III.   RPS's collection and reporting of Plaintiff's housing court proceeding was reasonable, and Plaintiff has no evidence to substantiate her contrary claim.**

Regardless of the legal theories advanced by Plaintiff, summary judgment must still be granted to RPS because Plaintiff has no factual basis to claim that RPS's reporting of a record that was collected directly at a public access terminal three weeks before it was reported was not a "reasonable" procedure, let alone a "willfully" unreasonably one.

**A.   Plaintiff has no evidence to support her claim that RPS's procedures were unreasonable with respect to the reporting of her housing court record.**

RPS went directly to the courthouse to collect Plaintiff's housing court record, had its highly-trained field researchers record all available data about that record at the time of collection, and then reported the record to Plaintiff's potential landlord displaying all available data about the case that had been entered into in RPS's database just weeks before. (SMF at ¶¶ 4, 17-18, 21-22.) That process was highly reasonable. In fact, even when an apparent error in data entry or the clerk's underlying database is alleged to have occurred, courts within the Second Circuit have

14

consistently held that reliance on the records received from a governmental agency is reasonable as a matter of law for purposes of compliance with § 1681e(b).  *See, e.g.*, *Frost v. Experian Information Solutions, Inc.*, No. 98 Civ. 2106, 1998 WL 765178, at *7 (S.D.N.Y. Oct. 30, 1998) ( "as a matter of law," a credit reporting agency is not liable for reporting inaccurate information obtained from a court, "absent prior notice from the consumer" about the allegedly inaccurate information); *Houston v. TRW Information Services, Inc.*, No. 88 Civ. 0186, 1989 WL 59850, at *4-5 (S.D.N.Y. May 1, 1989) ( "I conclude that TRW followed reasonable procedures in preparing the credit reports on Houston . . . .  Moreover, the burden of [having its records vendor] chec[k] beyond the [clerk's] Judgment Docket Book outweighs the potential that incomplete judgment information will be reported.  The omission of the vacatur was an unfortunate error for which TRW is not liable.").

Numerous other courts nationwide have also reached that same conclusion, including in the context of background screening companies that have used public access terminals to gather court record information.  *See, e.g.*, *Lucion G. Banks v. Hireright, Inc.*, No. BC 492317, 2014 Cal. Super. LEXIS 251, *13-14 (2014) (granting summary judgment: "HireRight sources the public record information for its screening reports from reliable sources - in this case, from the public records maintained and published directly by the Alameda County Superior Court.  It is undisputed that HireRight reported the information about Plaintiffs criminal records that had been made available on the Alameda County Superior Court's PAT [public access terminal]."); *Wright v. Experian Info. Sols., Inc.*, 805 F.3d 1232, 1240 (10th Cir. 2015) (defendant did not err by relying on LexisNexis to collect information from county recorder's website, because the erroneously reported lien was "not inaccurate on its face, inconsistent with information the CRAs already had on file, or obtained from a source that was known to be unreliable."); *Moore v. First Advantage Enter. Screening Corp.*, No. 4:12 CV00792, 2013 WL 1662959, at *21 (N.D. Ohio Apr. 17, 2013)

("Plaintiff has offered no authority to support the suggestion that a furnisher of information like First Advantage must pull and personally examine every document within a court's file instead of being able to rely upon the docket . . . . Plaintiff's position is untenable."); *Haro v. Shilo Inn, Bend LLC*, No. 08-6306, 2009 WL 2252105, at *7-9 (D. Or. July 24, 2009) (dismissing FCRA claim where the defendant had obtained electronic criminal records from the "Oregon Judicial Information Network website" and accurately reported the content of those records).

As these cases confirm, gathering public records directly from a clerk's database is reasonable. The substantial authority cited above also applies with particular force here given that Plaintiff has represented to the Court that she is "not contesting the accuracy of the data on the OCA's [public access] terminals." (Dkt. No. 67 at p. 23.) In fact, Plaintiff's theory that RPS should have used the OCA data file unequivocally confirms the reliability/currency of the public access terminals, as the terminals and the OCA file both display content from the same underlying database. Plaintiff also has never plead – and certainly could not do so at this late stage – what else she could claim claims that RPS possibly should have done to "reasonably" collect the record of her housing court case besides going directly to the primary governmental source of the data.

Because the reliability of the public access terminals is not in question, and because the FCRA and NYFCRA are not strict liability statutes, the *only* remaining argument Plaintiff could possibly advance in support of her claims is a contention that it was unreasonable for RPS to report a record that it had collected from the public access terminal three weeks earlier. Put another way, Plaintiff may seek to try and further amend her liability theory at the summary judgment stage by claiming that RPS had an obligation to re-check the public access terminal at a greater frequency than the three-week gap that was present between the time of the collection and reporting of record.

But, she has no evidence by which to make such a claim.[9]  She has no statistics regarding the percentage of nine-month-old housing court cases that would be expected to reach a disposition by month ten, such that she could argue that it was unreasonable for RPS to have not gone back to the terminal in that brief, three-week period between June and July 2015.  Her expert disclaimed any knowledge of such a percentage, and he further stated that he is not aware of any statistical study on which such a conclusion could be grounded or of which RPS could have been aware. (SMF at ¶¶ 37-38.)  When asked if he had attempted to engage in any "data-based analysis," of "what percentage of those cases" pending for even "six months without a disposition" would "ultimately result in some type of court disposition," Plaintiff's expert responded "No."  (*Id.* at ¶ 39.)  This Court also recently noted this failing.  In decision denying Plaintiff's motion to exclude RPS's industry-leading expert witness, the Court identified that Plaintiff's expert had undertaken no "data-driven analysis" to support his conclusions.  Dkt. No. 124 at p. 6 n.5.

Consequently, Plaintiff can advance no actual *evidence* that it would have been "practical and economically rational," *Wenning v. On-Site Manager, Inc.*, No. 14cv9693, 2016 U.S. Dist. LEXIS 81126, at *61 (S.D.N.Y. June 22, 2016), for RPS to have gathered and reported her record in a manner other than it did.  In the highly-analogous decision in *Wenning*, for instance, the court addressed the plaintiff's claim that the defendant "had a duty to supplement its reports with more

---

[9] Notably, other litigants and regulators have credited a standard that affirms RPS's practice as reasonable. For instance, the New York Attorney General agreed to a settlement with TransUnion, Equifax, and Experian, which created a working group of "data experts" to develop standards for reporting/updating civil case data, including to "determine whether information relating to the satisfaction of judgments and/or other updates are available on a reasonably timely basis from a given public record data source."  *See* https://ag.ny.gov/press-release/2015/ag-schneiderman-announces-groundbreaking-consumer-protection-settlement-three.  That working group determined that "civil public records – tax liens, civil judgments, and bankruptcies" could be "included on a credit report if they were refreshed by the [consumer reporting agency] at least every 90 days."    *See* https://www.consumerfinance.gov/data-research/research-reports/quarterly-consumer-credit-trends-public-records-credit-scores-and-credit-performance/.

That updating standard is *more lenient* than that used by RPS, including for Plaintiffs' record, which further belies any claim of unreasonable, or "willfully" unreasonable procedures.

specific information about plaintiffs' Housing Court cases." *Id.* at *60.  In granting summary judgment to the defendant under § 1681e(b), the court held that "plaintiffs have not come forward with any such evidence [showing the claimed unreasonableness of the defendant's procedures]; plaintiffs merely declare that On-Site should have supplemented the data in its reports." *Id.* at *61. The court noted "the need, under the FCRA, to balance the expense and efficacy of obtaining additional information," and it held that "Plaintiffs' failure to adduce such evidence, or indeed to engage in any evidence-based evaluation of the practicality and cost of requiring such [court record] supplementation, prevents them from reaching a jury on the question of reasonableness." *Id.*; *see also Childress v. Experian Info. Solutions, Inc.*, 790 F.3d 745, 747 (affirming summary judgment on FCRA claim regarding the reasonableness of the defendant's processes for updating bankruptcy court records: "The procedure urged by the plaintiff is not 'reasonable.'  It would put an enormous burden on the consumer credit-reporting agencies.  Or so it seems; it was *the plaintiff's burden* to establish the reasonableness of her proposed procedure.") (emphasis added). Summary judgment is required on those same grounds here.

      **B.**    **There is no evidence of any "willful" violation of the FCRA.**

    For the foregoing reasons, Plaintiff's claims should be dismissed in their entirety. However, at the very least, the record cannot support a "willful" violation of § 1681e(b), which is a heightened standard for claiming that a defendant used unreasonable procedures.

    To demonstrate "willful" noncompliance with the FCRA and obtain punitive damages, a plaintiff must demonstrate recklessness with proof of conduct entailing an "unjustifiably high risk of harm" that is "either known or so obvious that it should be known." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007).  "[A] company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but [also] shows that the company ran a risk of violating the law substantially greater than the risk

associated with a reading that was merely careless." *Id.* at 69.  Thus, to show willfulness, RPS's procedures must have been so unreasonable as to be reckless and objectively unjustifiable.  *Id.*

Because RPS's procedures were reasonable in the manners identified above, it necessarily follows that RPS's conduct was not willful.  Regardless, several factors have been identified by prior courts in dismissing like claims of a willful violation of the FCRA.  Those variables, as applied to this case, are as follows, <u>*each*</u> of which defeats the claimed "willful" violation:

- Plaintiff and her expert admit that the public access terminals are reliable.  It is further undisputed that RPS employed detailed procedures to collect dispositions when available directly from the clerk's offices and terminals, and to then update them, which is the very practice Plaintiff says in the Amended Complaint that RPS should have undertaken.  *E.g.*, *Frydman v. Experian Info. Solutions, Inc.*, No. 14cv9013, 2016 WL 5661596, at *40 (S.D.N.Y. Aug. 11, 2016) ("Each of the Defendants has provided a knowledgeable representative's statement setting forth its standard procedures for assuring the accuracy of information in consumers' credit files . . .  Frydman has not adduced any evidence that it was unreasonable for the Defendants to rely on such undertakings in the first instance.");

- RPS was not aware of any issue with the reliability of the data collected from the public access terminals.  It also was RPS's policy to also audit records previously collected for accuracy, which revealed no issues.  *E.g.*, *Wenning*, 2016 U.S. Dist. LEXIS 81126, at *77 ("[Plaintiffs] have not identified any evidence that On-Site actually knew that such usage was inaccurate or that On-Site subjectively appreciated the risk of inaccuracy.  On plaintiffs' willfulness claim, summary judgment must therefore be granted to On-Site.");

- RPS had no knowledge of any claimed disposition of Plaintiff's September 2014 housing court action prior to the time it was reported, and Plaintiff never submitted any dispute to RPS about her record.  *See id.; Ogbon*, 2013 U.S. Dist. LEXIS 50816, at *23 (granting summary judgment when the plaintiff had "identified no basis on which a jury could find that the defendants had a basis to question the accuracy of the" data it had obtained about the plaintiff); and

- Plaintiff admits she is aware of no "study" that would have possibly informed RPS that a three-week gap in time between collection and reporting of a nine-month old case created an "unjustifiably high risk of harm" of reporting an outdated record, which it surely did not.  Plaintiff's expert likewise was further forced to concede during his deposition that he too had not attempted any data-driven analysis of that issue and was aware of no "study" supporting a claim of risk based on such a short delay.  *See, e.g.*, *Robertson v. Experian Info. Solutions*, No. 1:CV09-0850, 2010 U.S. Dist. LEXIS 39616, at *14-15 (E.D.

> Pa. Apr. 10, 2010) ("Here, the plaintiff simply offers no evidence indicating willful or reckless conduct on the part of Trans Union or Experian . . . .  In light of her failure to meet her burden, we will grant summary judgment and dismiss the claims of punitive damages against Defendants.").

At bottom, Plaintiff's contention that it was a "willful" violation of the FCRA for RPS's to have collected data from the public access terminal and to then report that data to Hunter's Point just weeks later is contrary to all of the authority cited above, and she has provided no evidence-based benchmark by which such a claim could be objectively proven at trial.  Therefore, summary judgment must be granted as to that claim of a willful violation of the law.

## IV. Plaintiff's claim that the public access terminal reflected a disposition for her housing court proceeding on May 29, 2015 is inaccurate.

Finally, independent from any assessment of the reasonableness of RPS's procedures, to state a claim under the FCRA or the NYFCRA, Plaintiff must demonstrate that RPS inaccurately reported the record of her September 2014 housing court proceeding to Hunter's Point.  Plaintiff has staked her claim of inaccuracy in this case on her freelancers' review of public access terminals in 2019 and the associated class lists they developed, which she claimed showed the instances where "CoreLogic reported that a case's status was merely that it had been filed when in fact a disposition had been recorded before the report was even issued."  (Dkt. No. 36 at p. 4).  But discovery has revealed that Plaintiff's contention of an "inaccuracy" in that regard was false.

The public access terminal – even when Ms. Abadie viewed it in 2019 – did not reflect a "disposition" for Plaintiff's 2014 housing court action on May 29, 2015,[10] as claimed by Plaintiff.

---

[10] Plaintiff elsewhere claimed in her class certification briefing that her housing court action was disposed on October 2, 2014, presenting paper records of her case.  (Dkt. No. 36 at p. 12.)  She made no attempt to reconcile those conflicting dates, nor does she have paper files for any other class member.  Regardless, the class was certified by reference to the spreadsheets that she proposed, which erroneously reflect the claimed May 29, 2015 disposition, and which will form the basis for her proffered proof of inaccuracy at trial. Because Plaintiff sought and achieved certification on those spreadsheets, it is that proof of "inaccuracy" that controls.  *See, e.g.*, *E. Texas Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403-05 (1977) (plaintiff cannot fairly and adequately protect the interest of the class when she is not a member of her defined class).

(SMF at ¶¶ 27, 32-34.)  As even Plaintiff's own expert admitted, the "inactive" designation located by Ms. Abadie was not reflective of any type of housing court disposition.  (*Id.* at ¶ 36.)  Instead, Plaintiff's record simply reflected a "Clerks' Office" software system "conversion" entry in the "disposition" field, which reflects the software conversion that occurred in Manhattan housing court in on May 29, 2015.  (*Id.* at ¶ 34.)

Hence, Plaintiff cannot establish an "inaccuracy" using the very method that she claimed caused her to be included on the class lists and allowed her to serve as the class representative. *See, e.g.*, *Collins v. Experian Credit Reporting Serv.*, 494 F. Supp. 2d 127, 135 (D. Conn. 2007) ("The threshold question is whether the challenged credit information is accurate; if the information is accurate, no further inquiry into the reasonableness of the consumer reporting agency's procedures is necessary.").  Summary judgement is thus also required on that basis.

## CONCLUSION

WHEREFORE, CoreLogic Rental Property Solutions, LLC, respectfully requests that the Court grant its Motion for Summary Judgment and dismiss this action with prejudice.

Dated:  New York, New York
        June 19, 2020

                                    TROUTMAN SANDERS LLP


                                    By: /s/ Timothy J. St. George
                                    Timothy J. St. George (*pro hac vice*)
                                    1001 Haxall Point
                                    Richmond, VA 23219
                                    Telephone: (804) 697-1650
                                    Facsimile: (804) 698-5118

                                    *Attorneys for Defendant*

42531669                            21